[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10602

_____

D.C. Docket No. 2:12-cv-00138-RWS

RICHARD M. VILLARREAL,
on behalf of himself and all others similarly situated,

Plaintiff-Appellant,

versus

R.J. REYNOLDS TOBACCO COMPANY,
PINSTRIPE, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 5, 2016)

ON PETITION FOR REHEARING

Before ED CARNES, Chief Judge, TJOFLAT, HULL, MARCUS, WILSON,
WILLIAM PRYOR, MARTIN, JORDAN, ROSENBAUM, JULIE CARNES, and
JILL PRYOR, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

The main issue presented by this appeal is whether the Age Discrimination in Employment Act allows an unsuccessful job applicant to sue an employer for using a practice that has a disparate impact on older workers. Richard Villarreal sued R.J. Reynolds Tobacco Company and Pinstripe, Inc. for rejecting his job applications. All parties agree that Villarreal, as an applicant for employment, can sue for disparate treatment because the Act prohibits an employer from "fail[ing] or refus[ing] to hire . . . any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). But Villarreal and the Equal Employment Opportunity Commission, as amicus curiae, argue that an applicant can also sue an employer for disparate impact because the Act prohibits an employer from "limit[ing], segregat[ing], or classify[ing] his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." *Id.* § 623(a)(2). We conclude that the whole text of the Act makes clear that an applicant for employment cannot sue an employer for disparate impact because the applicant has no "status as an employee." *Id.* And we conclude that Villarreal is not entitled to equitable tolling of his claim of disparate treatment because he admitted facts that establish that he did not diligently pursue his rights. We affirm in part and remand for the panel to address the remaining issue about whether the continuing-violation doctrine makes Villarreal's claim of disparate treatment timely.

# I. BACKGROUND

On November 8, 2007, Villarreal applied for a position as a territory manager at R.J. Reynolds. He was 49 years old. Using guidelines provided by R.J. Reynolds, a contractor screened out Villarreal's application. The guidelines described the "targeted candidate" as someone "2–3 years out of college" who "adjusts easily to changes" and instructed the contractor to "stay away from" applicants "in sales for 8–10 years." Neither the contractor nor R.J. Reynolds told Villarreal that he had been rejected, and Villarreal did not follow up.

Over two years later, in April 2010, lawyers contacted Villarreal and told him that R.J. Reynolds had discriminated against him on the basis of his age. In May 2010, Villarreal filed a charge with the Equal Employment Opportunity Commission. Villarreal also applied to R.J. Reynolds five more times in the next two years and was rejected every time. He amended his charge to include these rejections and to add Pinstripe, which replaced the first contractor, as a respondent.

In April 2012, the Commission issued notices of right to sue with respect to R.J. Reynolds and Pinstripe. Villarreal brought a collective action against R.J. Reynolds and Pinstripe under the Act on behalf of "all applicants for the Territory Manager position who applied for the position since the date RJ Reynolds began its pattern or practice of discriminating against applicants over the age of 40 . . . ; who were 40 years of age or older at the time of their application; and who were

rejected for the position." The complaint alleged two counts: disparate treatment under section 4(a)(1) of the Act and disparate impact under section 4(a)(2) of the Act.

In anticipation of an objection of untimeliness, Villarreal also alleged facts to support equitable tolling of the limitations period that governed his complaint. He alleged that "he did not become aware until shortly before filing the charge that there was reason to believe that his 2007 application for the Territory Manager position had been rejected on account of his age." He also alleged that "[t]he facts necessary to support [his] charge of discrimination were not apparent to him, and could not have been apparent to him, until less than a month before he filed his May 17, 2010 EEOC charge."

R.J. Reynolds and Pinstripe moved to dismiss Villarreal's complaint in part. They moved to dismiss the disparate-impact count on the ground that section 4(a)(2) does not give a cause of action to applicants, and they moved to dismiss as untimely the parts of both counts based on the 2007 application. The district court dismissed the disparate-impact count and the untimely parts of both counts.

When Villarreal later moved for leave to amend the complaint, he alleged in his proposed amended complaint that he "was not an employee of . . . R.J. Reynolds . . . or related to anyone who was," that he "did not receive any communication from RJ Reynolds or anyone else informing him why he was not

hired," that he "did not even know whether his application had been reviewed at all," and that he was unaware of the screening guidelines. The district court denied leave to amend the complaint on the ground that amendment would be futile. It explained that Villarreal "has not alleged any misrepresentations or concealment that hindered [him] from learning of any alleged discrimination," that he "made no attempt to contact [R.J. Reynolds] and ascertain the basis for his application rejection," and that he "has not alleged any due diligence on his part." Villarreal later moved to dismiss the remaining parts of the complaint, and the district court dismissed them with prejudice.

A divided panel of this Court reversed. *Villarreal v. R.J. Reynolds Tobacco Co.*, 806 F.3d 1288, 1290 (11th Cir. 2015), *reh'g en banc granted, opinion vacated*, No. 15-10602 (11th Cir. Feb. 10, 2016). It concluded that section 4(a)(2) was ambiguous and deferred to the interpretation of the Commission announced in a rule. *Id.* It also concluded that equitable tolling was appropriate. *Id.* The panel did not address the continuing-violation doctrine, which Villarreal also raised in support of the timeliness of his claims. *Id.* at 1306 n.16. Judge Vinson, sitting by designation, dissented. *Id.* at 1306.

## II. STANDARDS OF REVIEW

"We review *de novo* the dismissal of a complaint for failure to state a claim, accepting all allegations in the complaint as true and construing facts in the light

most favorable to the plaintiff." *Harry v. Marchant*, 291 F.3d 767, 769 (11th Cir. 2002) (en banc). "We review the denial of a motion to amend for an abuse of discretion, but whether the motion is futile is a question of law that we review *de novo*." *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015).

## III. DISCUSSION

We divide our discussion in two parts. First, we explain that Villarreal failed to state a claim under section 4(a)(2) because he was a job applicant, not an employee of R.J. Reynolds. Second, we explain that Villarreal is not entitled to equitable tolling because he admits facts that disprove diligence.

### A. *Villarreal Failed to State a Claim Under Section 4(a)(2).*

Section 4(a)(2) of the Act makes it "unlawful for an employer . . . to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(2). We consider not only the text of section 4(a)(2) itself, but also the statutory context in sections 4(c)(2) and 4(a)(1). *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 167 (2012) ("The text must be construed as a whole."); *id.* at 170 ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning."); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory

language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.");
*Morrison-Knudsen Constr. Co. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 461 U.S. 624, 633 (1983) ("[W]e have often stated that a word is presumed to have the same meaning in all subsections of the same statute."). If the text of the statute is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

We conclude that Villarreal failed to state a claim of disparate impact. The plain text of section 4(a)(2) covers discrimination against employees. It does not cover applicants for employment.

The key phrase in section 4(a)(2) is "or otherwise adversely affect his status as an employee." 29 U.S.C. § 623(a)(2). By using "or otherwise" to join the verbs in this section, Congress made "depriv[ing] or tend[ing] to deprive any individual of employment opportunities" a subset of "adversely affect[ing] [the individual's] status as an employee." *Id.* In other words, section 4(a)(2) protects an individual only if he has a "status as an employee." *Id.*

This use of "or otherwise" to connect verbs is a familiar construction. For example, Congress allows the use of funds to extradite a United States citizen "to a foreign country that is under an obligation to surrender persons to the International

Criminal Court" if there are "satisfactory assurances to the United States that the country will not extradite or otherwise transfer that citizen to the International Criminal Court." 22 U.S.C. § 7402(a). As we understand that "extradite" is a subset of "transfer" in this statute, we also understand that "deprive or tend to deprive any individual of employment opportunities" is a subset of "adversely affect his status as an employee" in section 4(a)(2). Other examples abound. *See, e.g.*, 18 U.S.C. § 2345(b) ("inhibit or otherwise affect"); 25 U.S.C. § 1728(c) ("considered as income or resources or otherwise utilized"); 33 U.S.C. § 1518(a)(3) ("call at or otherwise utilize a deepwater port"). Even our own procedural rules use this construction. For example, a single judge of our Court "may not dismiss or otherwise determine an appeal or other proceeding." Fed. R. App. P. 27(c); *see also* 11th Cir. R. 27-1(d) (same); 11th Cir. R. 41-1(a) ("shows that a substantial question is to be presented to the Supreme Court or otherwise sets forth good cause for a stay"); 11th Cir. R. 42-1(b) ("fails to file a brief or other required papers within the time permitted, or otherwise fails to comply with the applicable rules" and "file documents out of time or otherwise remedy the default"). In each of these examples, the first action is a subset of the second action. So too is "deprive or tend to deprive" a subset of "adversely affect" in section 4(a)(2).

8

Villarreal cites a contrary interpretation of the phrase "or otherwise" in *Rine v. Imagitas, Inc.*, 590 F.3d 1215 (11th Cir. 2009), but we reject the reasoning in that opinion. The statute at issue in *Rine* made it unlawful to "knowingly disclose or otherwise make available" certain personal information. 18 U.S.C. § 2721(a). The panel wrote that the use of the disjunctive "or" "indicates alternatives and requires that those alternatives be treated separately." *Rine*, 590 F.3d at 1224 (quoting *Brown v. Budget Rent-A-Car Sys., Inc.*, 119 F.3d 922, 924 (11th Cir. 1997)). The panel also wrote that "Congress's use of 'otherwise' confirms that 'make available' means something different than, or unlike, disclosure." *Id.* But the panel—and the authorities it cited—discussed "or" and "otherwise" in isolation. Words can acquire different meanings when combined in a phrase, and the phrase "or otherwise" is different from the sum of its parts.

In her dissent, Judge Martin contends that our reading of the phrase "or otherwise adversely affect his status as an employee" renders superfluous the phrase "deprive or tend to deprive any individual of employment opportunities," Dissenting Op. of Martin, J., at 53–54, but the surplusage canon does not apply in this context. The phrase "or otherwise" operates as a catchall: the specific items that precede it are *meant* to be subsumed by what comes after the "or otherwise." *See Begay v. United States*, 553 U.S. 137, 153 (2008) (Scalia, J., concurring in the judgment) ("[T]he canon against surplusage has substantially less force when it

comes to interpreting a broad residual clause . . . .”). This construction allows the drafter to “add specificity about known dangers” while ensuring that “other [dangers], not readily imagined, [are] also encompassed.” *United States v. Persichilli*, 608 F.3d 34, 40 (1st Cir. 2010). In any event, the surplusage canon applies “only where a competing interpretation gives effect ‘to every clause and word of a statute.’” *Microsoft Corp. v. i4i Ltd. P’ship*, 564 U.S. 91, 106 (2011) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Judge Martin’s interpretation, which treats “or otherwise adversely affect his status as an employee” and “deprive or tend to deprive any individual of employment opportunities” as separate categories, does not give effect to every word because it reads “otherwise” out of the statute.

By making “deprive or tend to deprive any individual of employment opportunities” a subset of “adversely affect[ing] *his status as an employee*,” Congress limited section 4(a)(2) to discrimination against employees. Applicants who are not employees when alleged discrimination occurs do not have a “status as an employee.” Dictionaries confirm that the phrase “status as an employee” connotes a present fact. The Oxford English Dictionary primarily defines “status” in the legal context to mean “[t]he *fact or position of belonging* to a group which is subject to certain legal rights or limitations,” and it provides usage notes ranging from 1767 to 2002. *Status*, *Oxford English Dictionary* (online ed.) (emphasis

10

added) (all Internet materials as visited June 30, 2016, and available in Clerk of Court's case file). Other dictionaries have similar definitions. *See Status*, *A Dictionary of Modern Legal Usage* 828 (Bryan A. Garner ed., 2d ed. 1995) ("*belonging* to a particular class of persons to all of whom the law assigns particular legal powers, capacities, liabilities or incapacities" (emphasis added) (quoting 1 David M. Walker, *Principles of Scottish Private Law* 198 (3d ed. 1982))); *Status*, *Black's Law Dictionary* 1264 (Special Deluxe 5th ed. 1979) ("[s]tanding; *state or condition*; social position" (emphasis added)); *Status*, *Webster's New International Dictionary* 2463 (2d ed. 1961) (defining "status" in the legal context as "[t]he *condition* of a person by which the nature of his legal personality and his legal capacities are determined, and therefore the nature of the legal relations to the state or to other persons into which he may enter" (emphasis added)).The meaning of "as" also confirms that "his status as an employee" refers to a present fact. The Oxford English Dictionary defines "as" in the relevant sense to mean "[i]n the character, capacity, or function of." *As*, *Oxford English Dictionary* (online ed.).

Judge Martin's dissent stresses the breadth of the words "any individual," *see* Dissenting Op. of Martin, J., at 52–53, 56–57, but the dissent reads those words in isolation. "[E]ven though the word 'any' demands a broad interpretation, we must look beyond that word itself" to determine its ultimate scope. *Small v. United*

*States*, 544 U.S. 385, 388 (2005); *see also United States v. Alvarez-Sanchez*, 511 U.S. 350, 357 (1994) ("[R]espondent errs in placing dispositive weight on the broad statutory reference to 'any' law enforcement officer or agency without considering the rest of the statute."); *United States v. Palmer*, 16 U.S. 610, 631 (1818) (Marshall, C.J.) ("The words 'any person or persons,' are broad enough to comprehend every human being. But general words must . . . be limited . . . to those objects to which the legislature intended to apply them."). The words "any individual" in section 4(a)(2) are limited by the phrase "or otherwise affect his status as an employee," so the "individuals" that the statute covers are those with a "status as an employee." Judge Martin's dissent says "'any individual' means 'any individual,'" Dissenting Op. of Martin, J., at 56, but the whole text makes clear that "any individual" with a "status as an employee" means "any employee."

Judge Martin's dissent also contends that someone can have a "status as an employee" without being an employee, *see id.* at 54–55, but we disagree. Judge Martin's dissent cites the Dictionary Act for the proposition that "words used in the present tense include the future as well as the present," *id.* at 54 (quoting 1 U.S.C. § 1), but the word "status" is a noun, not a verb. Nouns do not have "tense." *See* Bryan A. Garner, *Tense*, *The Chicago Guide to Grammar, Usage, and Punctuation* 480 (2016) ("A *verb* quality that expresses the time of action—past, present, or future." (emphasis added)); Bryan A. Garner, *Tense*, *Garner's Modern American*

*Usage* 920 (3d ed. 2009) ("A *verb's* quality that shows the time in which an act, state, or condition occurs or occurred; the correspondence between a *verb* form and the concept of time." (emphases added)); *Carr v. United States*, 560 U.S. 438, 448 (2010) (explaining that section 1 of the Dictionary Act "ascribes significance to *verb* tense" (emphasis added)). We know that "status" connotes a present fact in section 4(a)(2) based on the plain meaning of the phrase "his status as an employee," not based on any "tense."

Judge Martin's dissent also cites judicial opinions that use the word "status" after an adjectival noun—"priority status," "seaman status," "objector status," etc.—to prove that status does not always connote a present fact. *See* Dissenting Op. of Martin, J., at 55 n.2. But even if we were to assume that snippets from judicial opinions can shed meaningful light on the meaning of a statute, *cf. United States v. Muckleshoot Indian Tribe*, 235 F.3d 429, 433 (9th Cir. 2000) ("Opinions, unlike statutes, are not usually written with the knowledge or expectation that each and every word may be the subject of searching analysis."), the examples provided by Judge Martin's dissent do not track the language of section 4(a)(2). The dissent might have a point if section 4(a)(2) applied to anyone who was "denied employee status"; but the statute instead applies to anyone who had "his status as an employee" adversely affected. The only examples in Judge Martin's dissent that come close to the actual language in the statute do not state that someone who

applies for a status has that status during the application process. For example, the
dissent cites *Santos v. Immigration & Naturalization Service*, 375 F.2d 262 (9th
Cir. 1967), because that decision states that an alien can be "'denied status as a
permanent resident.'" Dissenting Op. of Martin, J., at 55 (quoting *Santos*, at 264
n.1). But *Santos* states that an alien can attain status as a permanent resident only
*after* undergoing an application process, not that he had that status during the
application process. *See Santos*, 375 F.2d at 263 (noting an alien can apply for
"adjustment of status from non-immigrant to permanent resident").

Statutory context confirms our reading of section 4(a)(2). Section 4(c)(2)
applies to applicants as well as employees only because it adds the words "or as an
applicant for employment" to a provision that is otherwise largely parallel to
section 4(a)(2):

It shall be unlawful for a labor organization . . .

> to limit, segregate, or classify its membership, or to classify or
> fail or refuse to refer for employment any individual, in any
> way which would deprive or tend to deprive any individual of
> employment opportunities, or would limit such employment
> opportunities or otherwise adversely affect his status as an
> employee *or as an applicant for employment*, because of such
> individual's age.

29 U.S.C. § 623(c) (emphasis added). Because "[i]f possible, every word and every
provision is to be given effect" and "[n]one should needlessly be given an
interpretation that causes it to duplicate another provision or to have no

consequence," Scalia & Garner, *supra*, at 174, we know that the term "employee"

does not encompass "applicant for employment" in section 4(c)(2). And because

"[a] word or phrase is presumed to bear the same meaning throughout a text" and

"a material variation in terms suggests a variation in meaning," *id.* at 170, the term

"employee" and the phrase "deprive or tend to deprive any individual . . . or

otherwise adversely affect his status as an employee" in section 4(a)(2) do not

encompass an applicant for employment.

In her dissent, Judge Martin responds that section 4(c)(2) mentions

applicants because it, unlike section 4(a)(2), covers failures to "refer" someone for

employment, Dissenting Op. of Martin, J., at 58–60, but this argument does not

line up with Judge Martin's interpretation of section 4(a)(2). If "any individual"

always includes applicants, *see id.* at 56–57, and applicants can have their "status

as an employee" adversely affected, *see id.* at 53–55, then Congress had no need to

mention applicants in section 4(c)(2). The statute would mean the exact same

thing, under Judge Martin's interpretation, if the words "or as an applicant for

employment" were deleted. But that interpretation violates the surplusage canon.

*See* Scalia & Garner, *supra*, at 174.

We also contrast the text of section 4(a)(2) with the text of section 4(a)(1),

which does cover applicants. Section 4(a)(1) makes it unlawful for employers "to

*fail or refuse to hire* or to discharge any individual or otherwise discriminate

15

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). Unlike section 4(a)(1), section 4(a)(2) does not mention an employer refusing to hire someone. And unlike section 4(a)(2), section 4(a)(1) says nothing about a "status as an employee."

According to Judge Martin's dissent, a plurality of the Supreme Court has described "the 'key textual differences' between" sections 4(a)(1) and 4(a)(2) and, in so doing, said nothing about claims of disparate impact in hiring, Dissenting Op. of Martin, J., at 64 (quoting *Smith v. City of Jackson*, 544 U.S. 228, 236 n.6 (2005) (plurality op.)), but the plurality did not say that these "key textual differences" were the only differences between these two sections. *See Smith*, 544 U.S. at 236 n.6 (plurality op.) ("JUSTICE O'CONNOR ignores key textual differences between § 4(a)(1) . . . and § 4(a)(2)."). Indeed, in the very same paragraph, the plurality described section 4(a)(2) as a provision that covers employees. *See id.* ("[A]n employer who classifies his employees without respect to age may still be liable under the terms of [section 4(a)(2)] if such classification adversely affects the *employee* because of that *employee's* age . . . ." (emphases added)).

Villarreal argues, based on a different section of the Act, that "employee" in section 4(a)(2) means something other than employee, but his argument fails. Section 7(c)(1) creates a cause of action for "[a]ny person aggrieved" and provides

that the right of action "shall terminate upon the commencement of an action by the Equal Employment Opportunity Commission to enforce the right of *such employee* under this chapter." *Id.* § 626(c)(1) (emphasis added). Villarreal asserts that by equating "person" and "employee" in section 7(c)(1), Congress expanded "employee" to mean "any individual" in section 4(a)(2). But the statute defines "employee" as "an individual employed by any employer," *id.* § 630(f), which is also the common meaning of "employee." "It is very rare that a defined meaning can be replaced with another permissible meaning of the word on the basis of other textual indications; the definition is virtually conclusive." Scalia & Garner, *supra*, at 228. Section 7(c)(1) does not create ambiguity about the meaning of "employee" in section 4(a)(2).

Villarreal's other arguments that "employee" does not mean employee are even easier to reject. Villarreal cites *Robinson v. Shell Oil Co.*, which held that a prohibition on retaliation against employees in Title VII extended to former employees because of statutory context. *See* 519 U.S. at 345–46. But the Supreme Court did not interpret employee to mean job applicant in *Robinson*, and the statutory context in this appeal—specifically, sections 4(c)(2) and 4(a)(1)— suggests that they are different. Judge Martin's dissenting opinion adds that the definition of "employment agency" in Title VII uses "employees" to mean "prospective employees," Dissenting Op. of Martin, J., at 55–56 (quoting

17

*Robinson*, 519 U.S. at 343 n.3), but the language of that provision is nothing like the language in section 4(a)(2), *see* 42 U.S.C. § 2000e(c) (defining "employment agency" as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person"). Villarreal also cites section 201 of the Genetic Information Nondiscrimination Act of 2008, *id.* § 2000ff(2)(A)(i), which defines "employee" to include "applicant." But the applicable definition in the Age Discrimination in Employment Act does not include "applicant." *See* 29 U.S.C. § 630(f).

Villarreal tries to circumvent the plain meaning of the statute by citing decisions of the Supreme Court that interpret similar language in other statutes, but those decisions do not support his argument. Villarreal argues that, in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), the Supreme Court interpreted "otherwise make unavailable" in the Fair Housing Act and compared it to the phrase "otherwise adversely affect" in the Age Discrimination in Employment Act. *Id.* at 2519. The Supreme Court described both phrases as "catchall." *Id.* The use of the word "catchall" by the Supreme Court is agnostic about the present matter because the Court used the word to explain why the Housing Act creates a cause of action for disparate impact. *Id.* The Supreme Court has already held that section 4(a)(2) of

18

the Age Discrimination in Employment Act allows employees to allege disparate impact, *see Smith*, 544 U.S. 228, and the Court shed no light in *Inclusive Communities Project* on whether a job applicant may sue under section 4(a)(2).

Villarreal and Judge Martin's dissent argue that, in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), the Supreme Court interpreted then-identical language in Title VII to encompass applicants, *see* Dissenting Op. of Martin, J.,  at 60–63, but *Griggs* does not support their argument. The plaintiffs in *Griggs* were employees, *see Griggs*, 401 U.S. at 426 ("All the petitioners are employed at the Company[] . . . ."), and the opinion nowhere states that a non-employee applying for a job would be covered by the language in Title VII. The only "condition of employment" that the Supreme Court considered in *Griggs* was "a condition of employment *in or transfer to jobs*"—that is, a condition that employees graduate high school or pass a test before they could be promoted or transferred to a new position. *Griggs*, 401 U.S. 425–26 (emphasis added). Lest there be any doubt, on remand the district court entered an injunction in favor of present and future employees, not applicants "who may hereafter seek employment." *See Griggs v. Duke Power Co.*, No. C-210-G-66, 1972 WL 215, at *1 (M.D.N.C. Sept. 25, 1972) (defining "[t]he class of persons entitled to relief under this Order" as "[a]ll black persons employed" or "who may subsequently be employed").

Villarreal and Judge Martin's dissent contend that the Supreme Court has since described *Griggs* as a case about applicants, but they are incorrect. Villarreal quotes language about applicants and *Griggs* from *Dothard v. Rawlinson*, 433 U.S. 321, 329 (1977), but because the Supreme Court decided *Dothard* after Congress added language about applicants to Title VII, *see* 42 U.S.C. § 2000e-2(a)(2) ("employees or applicants for employment"), we do not consider this dicta significant. Judge Martin's dissent quotes language about "hiring criteria" and *Griggs* from *Inclusive Communities Project*. Dissenting Op. of Martin, J., at 49, 62 (quoting *Inclusive Cmtys. Project*, 135 S. Ct. at 2517). But the Supreme Court was discussing how the "rule" announced in *Griggs*—that "employment practices" are permissible if they have a "'manifest relationship' to job performance"—would apply, "for example," "in a disparate-impact case" brought by an applicant under Title VII as it is written *today*. *Inclusive Cmtys. Project*, 135 S. Ct. at 2517 (quoting *Griggs*, 401 U.S. at 432). The Supreme Court did not say that *Griggs*—a case that was clearly about promotion and transfer policies—involved "hiring criteria" for first-time applicants. *See also Connecticut v. Teal*, 457 U.S. 440, 446 (1982) (describing *Griggs* as a case about "employees"); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 426 (1975) (describing *Griggs* as a case about "transferees"); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 664 (1989) (Stevens, J., joined by Brennan, Marshall, and Blackmun, JJ., dissenting)

(describing *Griggs* as a case "in which a class of utility company *employees* challenged the conditioning of entry into higher paying jobs upon a high school education or passage of two written tests" (emphasis added)). Indeed, nine current or former Justices have written or joined opinions describing section 4(a)(2) as protecting employees, not applicants. *See Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 96 n.13 (2008) (explaining that the statute prohibits acts that "deprive or tend to deprive . . . or otherwise adversely affect [employees] . . . because of . . . age" (alterations in original) (quoting 29 U.S.C. § 623(a)(2)); *Smith*, 544 U.S. at 236 (plurality opinion) ("[T]he text focuses on the *effects* of the action on the employee rather than the motivation for the action of the employer."); *id.* at 266 (O'Connor, J., joined by Kennedy and Thomas, JJ., concurring in the judgment) ("Section 4(a)(2), of course, does not apply to 'applicants for employment' at all— it is only § 4(a)(1) that protects this group.").

Villarreal and the Commission next argue about the meaning of the parallel provision in Title VII based on legislative history, but we do not consider legislative history when the text is clear. "[I]n interpreting a statute a court should always turn first to one, cardinal canon before others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). "When the words of a statute are unambiguous, then, this first

21

canon is also the last: 'judicial inquiry is complete.'" *Id.* at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)); *accord Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) (en banc). "Even if a statute's legislative history evinces an intent contrary to its straightforward statutory command, 'we do not resort to legislative history to cloud a statutory text that is clear.'" *Harry*, 291 F.3d at 772 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994)). To the extent we previously have ruled or suggested differently, we now disavow it. Because the text is clear, "[w]e will, as we must, 'presume that Congress said what it meant and meant what it said.'" *Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1316 (11th Cir. 2015) (quoting *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc)).

Villarreal and the Commission also contend that the purpose of the Act requires us to ignore the plain text, but "[o]ur job is to follow the text even if doing so will supposedly 'undercut a basic objective of the statute,'" *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2169 (2015) (quoting *Baker Botts*, 135 S. Ct. at 2170 (Breyer, J., dissenting)). Elevating general notions of purpose over the plain meaning of the text is inconsistent with our judicial duty to interpret the law as written. *See Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 126 (1989) ("Our task is to apply the text, not to improve upon it."); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008) ("We are not at liberty to rewrite the statute to

reflect a meaning we deem more desirable. Instead, we must give effect to the text Congress enacted . . . ."); *Noble State Bank v. Haskell*, 219 U.S. 575, 580 (1911) ("We fully understand the practical importance of the question, and the very powerful argument that can be made against the wisdom of the legislation, but on that point we have nothing to say, as it is not our concern."). It also disregards "the processes of [legislative] compromise and, in the end, prevents the effectuation of congressional intent." *Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986). "Congress may be unanimous in its intent to stamp out some vague social or economic evil," but "because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises." *Id.*

Finally, Villarreal and the Commission urge us to defer to the Commission's interpretation of the statute, but we do not defer to an agency's interpretation of a statute when the text is clear. "Statutory language is ambiguous if it is susceptible to more than one reasonable interpretation," *Med. Transp. Mgmt. Corp. v. Comm'r of IRS*, 506 F.3d 1364, 1368 (11th Cir. 2007), and a forced meaning does not create ambiguity. Because "[t]he judiciary is the final authority on issues of statutory construction," we must first "employ[] [the] traditional tools of statutory construction" to determine whether the meaning of the statute is clear. *Chevron*, 467 U.S. at 843 n.9. Although employing the traditional tools of statutory

construction may require some effort, that effort does not make a text ambiguous. *See Wagner Seed Co. v. Bush*, 946 F.2d 918, 924 (D.C. Cir. 1991). We have employed the traditional tools of statutory interpretation here, and we conclude that the only reasonable meaning of the statute is that a job applicant cannot sue under section 4(a)(2).

Congress did not leave applicants without recourse. Section 4(a)(1) provides them with a cause of action for disparate treatment. *See* 29 U.S.C. § 623(a)(1). To prove this cause of action using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), statistics about an employer's practice "may be relevant to any showing of pretext." *Id.* at 804–05. If an applicant foregoes the burden-shifting framework and instead "presents circumstantial evidence [to] create[] a triable issue concerning the employer's discriminatory intent," *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011), general evidence of a discriminatory practice also may be relevant in proving his case. But Villarreal voluntarily dismissed his timely claims of disparate treatment. As to his claim of disparate impact, we conclude that he failed to state a claim under section 4(a)(2) because the text protects employees, not applicants.

### B. Villarreal Admits Facts That Foreclose Equitable Tolling.

Villarreal argues that he alleged facts that would entitle him to equitable tolling of his remaining claim of disparate treatment. The party seeking equitable

24

tolling has the burden of proof, *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 755–56 (2016), although he need not make any allegations about equitable tolling in his complaint, *see LaGrasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). A plaintiff nonetheless can plead himself out of court by alleging facts that foreclose a finding of diligence or extraordinary circumstances, both of which are required for equitable tolling, *see Menominee Indian Tribe*, 136 S. Ct. at 755–56. Villarreal did so here by alleging facts that prevent him from proving diligence.

The general test for equitable tolling requires the party seeking tolling to prove "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 755 (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)). Although the Supreme Court has stopped short of holding that this test applies in all contexts, *see id.* at 756 n.2, we have applied it in a variety of contexts, *see, e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1197, 1200 (11th Cir. 2008) (Railway Labor Act); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154–55 (11th Cir. 2005) (Torture Victim Protection Act); *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999) (Antiterrorism and Effective Death Penalty Act); *see also Jackson v. Astrue*, 506 F.3d 1349, 1353 (11th Cir. 2007) (requiring extraordinary

circumstances in an action under the Social Security Act); *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993) (requiring due diligence in an action under the Public Vessels Act and the Suits in Admiralty Act). R.J. Reynolds argues that this general test applies, but Villarreal argues for a special test.

We hold that the general test applies. We reject a special test because the "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984). "[I]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Id.* (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)). In the antidiscrimination context, "[b]y choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (alteration in original) (quoting *Mohasco Corp.*, 447 U.S. at 825). "[T]he costs associated with processing and defending stale or dormant claims outweigh the federal interest in guaranteeing a remedy to every victim of discrimination." *Mohasco Corp.*, 447 U.S. at 820. For these reasons, "[f]ederal courts have typically extended equitable relief only

sparingly," *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990), and

requiring proof of diligence and extraordinary circumstances serves these goals.

We also observe that other circuits have applied this general test or a

materially similar one in discrimination cases. *See Dyson v. Dist. of Columbia*, 710

F.3d 415, 421 (D.C. Cir. 2013); *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d

74, 80–81 (2d Cir. 2003); *Lee v. Cook County*, 635 F.3d 969, 972 (7th Cir. 2011).

The Sixth Circuit considers diligence, the reasonableness of ignorance, lack of

notice, lack of constructive knowledge, and prejudice to the defendant. *See Amini*

*v. Oberlin Coll.*, 259 F.3d 493, 500 (6th Cir. 2001). The Eighth Circuit denies

equitable tolling when the plaintiff's neglect is inexcusable. *See Anderson v.*

*Unisys Corp.*, 47 F.3d 302, 306–07 (8th Cir. 1995). The Ninth Circuit considers

diligence and limits equitable tolling to "extreme cases." *See Scholar v. Pac. Bell*,

963 F.2d 264, 267–68 (9th Cir. 1992). And the Tenth Circuit requires "active

deception" by the defendant and diligence by the plaintiff. *See Montoya v. Chao*,

296 F.3d 952, 957–58 (10th Cir. 2002) (quoting *Cottrell v. Newspaper Agency*

*Corp.*, 590 F.2d 836, 838–39 (10th Cir. 1979)).

Villarreal cites *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924

(5th Cir. 1975), but that decision involved active deception by the employer. We

explained in *Reeb* that the employer "actively sought to mislead Mrs. Reeb in

informing her that adequate funds for her program would no longer be available."

*Id.* at 930. We held that "[i]n these circumstances we apply the familiar equitable modification to statutes of limitation: the statute does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Id.* Here, Villarreal did not allege or attempt to allege that R.J. Reynolds actively misled him. As a result, the general test applies: a plaintiff seeking equitable tolling must prove diligence and extraordinary circumstances.

Villarreal is not entitled to equitable tolling because he admitted facts that foreclose a finding of diligence. Specifically, he alleged that he did nothing for more than two years between his initial application and the communication from the lawyer. Villarreal argues that any inquiry would have been futile, but even assuming that futility is an exception to the diligence requirement, it would not apply when a plaintiff does nothing to investigate the *status* of his application, as opposed to the *reasons* for his rejection. We have no difficulty concluding, as a matter of law, that a plaintiff who does nothing for two years is not diligent. *Cf. Amini*, 259 F.3d at 501 (concluding that a plaintiff was not diligent despite "'regular' computer visits to [the employer's] website, as well as a physical visit to the campus . . . in which [he] searched the [employer's] announcement boards for information on the new hire" (citation omitted)).

In his partial dissent, Judge Jordan argues that we should not decide whether Villarreal is entitled to equitable tolling because Villarreal's complaint and proposed amended complaint are silent as to how Villarreal learned that R.J. Reynolds rejected his application and whether Villarreal acted diligently. This silence, according to Judge Jordan, is "not an affirmative allegation" but an "omission" that prohibits dismissal of Villarreal's complaint.  Op. of Jordan, J., at  34–36. We disagree.

Judge Jordan's assertion runs counter to the record and ignores Villareal's argument. In his proposed amended complaint, Villarreal explained that he learned about the rejection of his application from an attorney in 2010, not by his own diligence. *See* Pl.'s Proposed Am. Compl. ¶ 28 (Until 2010 "[Villarreal] did not even know whether his application had been reviewed at all, much less whether it had been rejected or screened out."). As a result, the district court denied Villarreal's motion to file an amended complaint in part because Villarreal had failed to allege "any due diligence on his part to determine the status of his 2007 application." Villarreal has never contested that he did nothing to ascertain the status of his application until 2010. He neither contested his lack of diligence before the district court, nor has he contested it on appeal. Villarreal instead has argued that he was not required to inquire about the status of his application and exercise any due diligence. But when Villarreal chose to anticipate the affirmative

defense of equitable tolling in his complaint, he bore the burden of alleging facts to support that defense. And this burden required him to allege that he was diligent, s*ee Menominee Indian Tribe*, 136 S. Ct. at 755–56, which he did not do.

We conclude that equitable tolling does not apply to the claim of disparate treatment, and we affirm in part the dismissal of that claim and the denial of leave to amend the complaint. Villarreal also argued before the panel that the continuing-violation doctrine makes the claim timely, but the panel did not address this argument. We exercise our discretion to remand this argument to the panel, and we express no view on the issue.

## IV. CONCLUSION

We **AFFIRM** the dismissal of the claim of disparate impact, and we **AFFIRM IN PART** the dismissal of the claim of disparate treatment and the denial of leave to amend the complaint. We **REMAND** to the panel to address the continuing-violation doctrine in the first instance.

JORDAN, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's ultimate conclusion that Mr. Villarreal cannot assert a disparate impact claim against R.J. Reynolds. But I write separately because I think there is another way to read 29 U.S.C. § 623(a)(2), one that would give effect to each word in this provision. Although Mr. Villarreal would not benefit from my reading of § 623(a)(2), I offer it for the consideration of others who may be called upon to interpret the statute in the future.

At first glance, it might appear that the disparate impact provision of the ADEA is fairly susceptible to two possible interpretations—i.e., one that permits job applicants to bring disparate impact claims under the ADEA and one that does not. If that were the case, I would agree with Judge Martin that we should defer to the views of the EEOC, particularly when its position has been consistent for over three decades. The problem, in my view, is that both of these possible interpretations fail to give effect to some language in the text.

"It is our duty to give effect, if possible, to every clause and word of a statute." *United States v. Menasche*, 348 U.S. 528, 538–39 (1955). If, in keeping with this duty, we can ascertain the statute's plain meaning, then there is no ambiguity and no need to defer to the agency's interpretation. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that his

bCongress had an intention on the precise question at issue, that intention is the law and must be given effect."). Significantly, a statute is not ambiguous merely because the parties present "dueling characterizations of what Congress 'really meant.'" *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225 (11th Cir. 2001). *Accord Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 461 (1999) (Thomas, J., joined by Scalia, J., dissenting) ("A mere disagreement among litigants over the meaning of a statute does not prove ambiguity; it usually means that one of the litigants is simply wrong.").

The disparate impact provision of the ADEA, § 623(a)(2), says that an employer may not "limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age[.]" Under the majority's reading of the statute, an "individual" can bring a disparate impact claim under the ADEA only if he currently has a "status as an employee[.]" In other words, the majority reads the statutory language as if the word "individual" were replaced with the word "employee":

> to limit, segregate, or classify his employees in any way which would deprive or tend to deprive ~~any individual~~ [an employee] of employment opportunities or otherwise adversely affect his status as an employee, because of [his] age[.]

*Id.* (strikethrough and brackets added).  The dissent, for its part, reads the language as if the statute targeted the impact of an employer's conduct toward "any individual," and not just "his employees":

> to limit, segregate, or classify ~~his employees~~ [any individual] in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age[.]

*Id.* (strikethrough and bracket added).  In my view, both readings rewrite language in the relevant statutory text.

The statute uses "individual" twice ("any individual" and "such individual"), and it also uses "employee" twice ("his employees" and "employee").  If we are trying to give effect to *both* critical terms—"his employees" and "any individual"—the reading that makes the most sense to me is that a job applicant ("any individual") can bring an ADEA claim under a disparate impact theory, but only if something the employer has done vis-à-vis "his employees" violates the ADEA by "limit[ing], segregat[ing] or classify[ing]" those employees.  So, if an employer's practice with respect to his employees violates the ADEA, and that same practice has a disparate impact on job applicants, those applicants can sue under § 623(a)(2).

To illustrate, imagine a scenario where a company decides to begin using questionnaires to test its workers' social media savvy, even though such knowledge has no bearing on the employees' ability to perform their jobs.  The

company takes each employee's performance on the questionnaire into account when it makes promotion decisions.  It also distributes the questionnaire to job applicants, and uses each applicant's performance in making hiring decisions. Imagine also that the questionnaire requirement disadvantages individuals over the age of 40 in a disproportionate way.  In that scenario, the employer's conduct towards his employees has a disparate impact on current employees as well as job applicants.  And in that scenario, I think a job applicant can sue under § 623(a)(2). I recognize that reading provides only a narrow set of viable disparate impact claims by job applicants, but it gives effect to the way § 623(a)(2) is written.

Mr. Villarreal, however, challenges only R.J. Reynolds' hiring practices, and not conduct that affects the company's current employees.  He therefore has not made out a disparate impact claim under my reading of the statute, and I concur in the judgment with respect to the disparate impact claim.

As for the equitable tolling issue, I agree with Judge Martin's dissent.  In ADEA suits, the applicable limitations period begins to run once the prospective employee knows or should know than an unlawful employment practice has been committed.  *See Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 760 (11th Cir. 1995).  In his complaint and proposed amended complaint, Mr. Villarreal alleged that he did not know the information necessary to support his ADEA claim until April of 2010.  He also alleged that he was unaware of the resume screening

34

practices R.J. Reynolds used, and that R.J. Reynolds did not tell him why he had been rejected.  The complaints are silent as to how Mr. Villarreal learned he had been rejected, whether he learned that R.J. Reynolds hired an individual under the age of 40 to fill the territory manager position, and when R.J. Reynolds filled the position with a younger candidate.  Without a more developed record, it is not clear to me when Mr. Villarreal should have known that an unlawful employment practice had been committed and what Mr. Villarreal did to find out.  Those are fact questions.  And because tolling is a fact-intensive inquiry, we have explained that "[s]ummary judgment is often inappropriate when tolling is at issue in an ADEA action."  *Cocke v. Merrill Lynch & Co.*, 817 F.2d 1559, 1561 (11th Cir. 1987).  The same is true, of course, at the motion to dismiss stage.

The majority says that Mr. Villarreal admitted facts, on the face of his complaints, which foreclose a finding of diligence.  According to the majority, Mr. Villarreal specifically alleged that he did nothing for more than two years between his initial application and the communication from the lawyer.  *See* Maj. Op. at 28.  But Mr. Villarreal made no such allegation.  Mr. Villarreal said nothing in his complaint or proposed amended complaint about what steps he took, if any, to pursue his rights.  And he didn't have to.  Complaints need not anticipate defenses and attempt to defeat them.  *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  They need only allege enough facts to show that a claim for relief is plausible.  *See Bell*

35

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a plaintiff may plead himself out of court by making affirmative allegations that show there is a bulletproof defense, an omission (i.e., silence) is not an affirmative allegation, particularly not at the Rule 12(b)(6) stage.  Because we must view the complaint in the light most favorable to Mr. Villarreal and draw all reasonable inferences in his favor, *see McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005), I think the majority errs in holding that dismissal was appropriate on statute of limitations grounds.

ROSENBAUM, Circuit Judge, concurring in part and dissenting in part:

This is a difficult case, but not because the statutory language we must construe is unclear—in my opinion, it isn't.  No, this case is challenging because despite the clarity of the statutory language, the agency charged with administering the statute has, for nearly the past 50 years—through both Republican and Democrat administrations—consistently construed it in a way that conflicts with what appears to me to be the objectively indisputable meaning of the statutory language.  That fact gives me serious pause.  And so I have examined and reexamined the statutory language for ambiguity.  Despite my best efforts, I am unable to find any.  Since the statute is, in my view, susceptible of only a single interpretation, as the Majority points out, we must abide by its plain meaning, without resorting to the administering agency's construction.

Though I agree with the Majority on the interpretation of the ADEA, I disagree with the Majority on the equitable-tolling issue, for the reasons expressed by both Judges Martin and Jordan.  So I dissent from the Majority opinion and join the dissents on that issue.

## I.

By any measure, in my view, the statutory language of § 4(a)(2) of the Age Discrimination in Employment Act ("ADEA") is unambiguous.  I do not see how the statutory language itself, the structure of the ADEA, and the historical

sequence of amendments and proposed amendments to both the ADEA and Title VII, on which the ADEA was based, leave any other possibility.  I write separately to explain why this is so.

## A.

The Majority has already explained why the statutory language is clear.  I agree with that analysis and add the following.

Section 4(a)(2) makes it "unlawful for an employer . . . to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(2).  The term "otherwise" in this statute must mean something.  If not, Congress could have left it out, and the statute could have stated simply, "in any way which would deprive or tend to deprive any individual of employment opportunities or adversely affect his status as an employee . . . ."  And if that were the case, the phrases "in any way which would deprive or tend to deprive any individual of employment opportunities" and "adversely affect his status as an employee" could be read in the disjunctive, entirely independent of each other, allowing a plaintiff to show that an employer's actions violated his rights either by "depriv[ing] or tend[ing] to deprive [him] of employment opportunities" or by "adversely affect[ing] his status as an employee."

But that is not what § 4(a)(2) says.  It uses the word "otherwise" to modify the phrase "adversely affect his status as an employee."  And "otherwise" has meaning.  "Otherwise" signals that the two phrases in § 4(a)(2) cannot be entirely independent of each other; instead, a relationship between the two phrases exists. In that relationship, each phrase describes a mutually exclusive subset of the universe of actions that "adversely affect . . . status as an employee."  Together, these two subsets compose the entirety of the universe of actions that "adversely affect . . . status as an employee."

"Otherwise" means "[i]n another way; differently."  *Otherwise*, The American Heritage Dictionary of the English Language (4th ed. 2000).  Because "otherwise" is an adverb that modifies "adversely affect" in this case, "otherwise adversely affect his status as an employee" refers to actions that would "adversely affect . . . status as an employee" in any way that is different from the manner in which "depriv[ing] or tend[ing] to deprive any individual of employment opportunities" would "adversely affect . . . status as an employee."  So the first phrase—"in any way which would deprive or tend to deprive any individual of employment opportunities"—refers to actions that limit or preclude, for example, promotion opportunities, while the second—"otherwise adversely affect . . . status as an employee"—contemplates actions that would, for instance, result in demotions, layoffs, or terminations.

Because of the word "otherwise," no other construction makes sense to me.

And since the word "otherwise" necessarily means that "depriv[ing] or tend[ing] to deprive any individual of employment opportunities" is a subset of "adversely affect[ing] . . . status as an employee," § 4(a)(2) cannot cover disparate-income hiring claims. "[D]epriv[ing] or tend[ing] to deprive any individual of employment opportunities" by not hiring a person who is not an employee cannot "adversely affect his status as an employee" because he has no "status as an employee." Instead, his status is and remains that of a non-employee.

Plus, "affect" means "[t]o have an influence on or effect a change in." *Affect*, The American Heritage Dictionary of the English Language (4th ed. 2000). But to change something, it must exist in the first place. If a person has no "status as an employee," "depriv[ing] or tend[ing] to deprive" that person "of employment opportunities" does not change that person's status as a non-employee; he started as a non-employee, and he remains a non-employee.

And finally, "adversely" means in a manner "[c]ontrary to one's interests or welfare; harmful or unfavorable." *Adverse*, The American Heritage Dictionary of the English Language (4th ed. 2000). So unfavorably changing a person's status as an employee necessarily refers to harming that person's status as an employee. If a person is not an employee, there is no "status as an employee" that an employer can harm.

So the language of § 4(a)(2) is susceptible of only a single interpretation that makes sense to me—and that interpretation does not provide for coverage of disparate-impact hiring claims.

## B.

The Majority also describes how the structure of the ADEA requires the interpretation of § 4(a)(2) as not providing coverage for disparate-impact hiring claims.  I concur in that discussion but wish to further elaborate.

In particular, the Majority compares § 4(a)(2) to § 4(c)(2), noting that the provisions are "largely parallel" except that § 4(c)(2) includes the phrase "or as an applicant for employment" after its use of the term "employee."   To demonstrate why this point is so persuasive, it is helpful to look at both statutes together.

Section 4(a)(2) makes it unlawful for an employer

> **to limit, segregate, or classify** his employees **in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age**.

29 U.S.C. § 623(a)(2) (emphasis added).  Section 4(c)(2) makes it unlawful for a labor organization

> **to limit, segregate, or classify** its membership, or to classify or fail or refuse to refer for employment any individual, **in any way which would deprive or tend to deprive any individual of employment opportunities**, or would limit such employment opportunities **or otherwise adversely affect his status as an employee** *or*

41

> *as an applicant for employment*, **because of such individual's age**.

29 U.S.C. § 623(c)(2) (emphasis added).  The bolded portions of each statute are exactly the same.  As for the regular-style portions of the statutes, though they are different, they do not differ in a manner that affects the analysis of whether each statute contemplates coverage of applicants for employment.

True, as Judge Martin points out, § 4(c)(2) deals with labor organizations and, in part, their role in employment opportunities, but that fact does not explain why the phrase "or as an applicant for employment" needed to be added in § 4(c)(2) to cover applicants for employment if it did not need to be included in § 4(a)(2) to cover applicants for employment.  Nor have I been able to figure out why the fact that § 4(c)(2) deals with labor organizations while § 4(a)(2) deals with employers matters to the analysis of why the phrase "or as an applicant for employment" appears in § 4(c)(2) but not § 4(a)(2).

It seems to me that if the language in § 4(a)(2) covered applicants for employment, the exact same language in § 4(c)(2) would suffice to do the same thing—regardless of the fact that one statute addresses employers and the other, labor organizations.  Yet Congress felt the need to add the phrase "or as an applicant for employment" after "or otherwise adversely affect his status as an employee" in § 4(c)(2) to cover applicants.  Why would Congress do that if "applicant[s] for employment" were already covered by the language in § 4(a)(2)?

The phrase "applicant [or applicants] for employment" also appears in other places in the ADEA.  *See, e.g.*, 29 U.S.C. § 623(d); 29 U.S.C. § 631(b); 29 U.S.C. §§ 633a(a), (b).  Clearly, Congress knew how to and did expressly include "applicants for employment" when it wished to do so.  But conspicuously absent from § 4(a)(2) is any reference to "applicants for employment."  We must account for this fact in a meaningful way.  The only way that makes sense to me is that Congress provided coverage for disparate-impact hiring-related claims under §4(c)(2) but not under § 4(a)(2).

## C.

The historical chronology of events relating to the enactment and amendments of the ADEA and Title VII further demonstrates that § 4(a)(2) does not cover disparate-impact hiring claims.[1]

---

[1] Judge Martin suggests that we should not consider the legislative sequence of events. *See* Martin Dissent at n.5.  In support of this position, she relies on *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), as an example of a case where the Supreme Court "refused to conclude that Congress 'repeatedly declin[ing] to enact express preemption provisions' implied anything 'simply because the silence of Congress is ambiguous.'"  *Id.* at 386–88, 120 S. Ct. at 2301–02.  The circumstances at issue in *Crosby*, however, are readily distinguishable from those in this case, and I respectfully disagree that *Crosby* provides any support for the notion that the legislative sequence of amendments in this case is irrelevant.  In *Crosby*, Massachusetts enacted a statute barring state entities from buying goods or services from companies doing business with Burma.  Three months later, Congress passed a law imposing mandatory and conditional sanctions on Burma.  The Supreme Court found Massachusetts's law to be preempted by federal law because it stood as an obstacle to the accomplishment and execution of the purposes and objectives of Congress.  *Id.* at 372-73.  In doing so, the Court rejected Massachusetts's argument that Congress's failure to preempt the state act demonstrated "implicit permission."  *Id.* at 387-88.  In reaching this conclusion, the Court explained the unique nature of preemption:

In 1964, Congress enacted the Civil Rights Act of 1964.  The ADEA, which Congress enacted on December 15, 1967, was modeled after the Civil Rights Act of 1964.  So § 703(a)(2) of the Civil Rights Act of 1964 and § 4(a)(2) of the ADEA, at the time it was enacted, were exactly the same, except for the groups that each provision protected.  Section 703(a)(2) stated,

> It shall be an unlawful employment practice for an employer—(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

---

> A failure to provide for preemption expressly may reflect nothing more than the settled character of implied preemption doctrine that courts will dependably apply, and in any event, the existence of conflict cognizable under the Supremacy Clause does not depend on express congressional recognition that federal and state law may conflict. . . .   The State's inference of congressional intent is ***unwarranted here, therefore***, simply because the silence of Congress is ambiguous.

*Id.* (citation omitted) (emphasis added).  In other words, the mere fact that Congress did not expressly preempt state action in the original statute or amend the statute later to preempt state action did not mean that Congress intended to authorize state action because Congress can impliedly preempt state action.  Of course, Villarreal's case does not involve preemption, so for that reason alone, *Crosby* is not instructive.  But, in any case, I do not suggest considering Congress's failure to amend § 4(a)(2) of the ADEA by adding the words "applicants for employment," in a vacuum, like the state did in *Crosby*.  Instead, my point is that a *comparison* of the amendment made to § 703(a)(2) of Title VII—the statute on which the ADEA was based—to the failure to make the same or similar amendment to the exact same language in § 4(a)(2) of the ADEA, all within the same general time frame as Congress otherwise amended the ADEA to add the same phrase that it added to § 703(a)(2) of Title VII—"applicants for employment"—is meaningful.  This sequence of events indicates that Congress understood a difference between including the language "applicants for employment" and not doing so, and it acted deliberately in choosing to add that language to Title VII's counterpart to the ADEA's § 4(a)(2) and to other sections of the ADEA but not to § 4(a)(2).

Civil Rights Act of 1964, Pub. L. 88-352, 78 Stat. 241, 255.

But significantly, in February 1967—ten months before Congress enacted the ADEA—it considered Senate Bill 1026, which sought to amend § 703(a)(2) of the Civil Rights Act of 1964 to "[a]dd the phrase 'or applicants for employment' after the phrase 'his employees in section 703(a)(2)." 113 CONG. REC. 3951 (1967). While the amendment did not pass in 1967, Congress considered similar bills proposing the same amendment until it ultimately enacted the Equal Employment Act of 1972 on March 24, 1972. That Act amended § 703(a)(2) of Title VII to add the phrase "or applicants for employment" after the phrase "his employees." *See* Equal Employment Opportunity Act of 1972, Pub. L. 92-261, 86 Stat. 103, 109.

In stark contrast, Congress has never similarly amended the ADEA's parallel § 4(a)(2). Instead, to this day, unlike § 703(a)(2), § 4(a)(2) continues to lack the phrase "or applicants for employment." That Congress had considered amending the very same language in Title VII that appears in § 4(a)(2) of the ADEA, to add the phrase "or applicants for employment"—even before Congress enacted the ADEA—and that it ultimately did amend that same language in Title VII but did not so amend § 4(a)(2), again strongly suggests that Congress did not intend to cover disparate-impact hiring claims in § 4(a)(2) of the ADEA.

45

This historical fact takes on even more significance, in light of amendments to the ADEA that Congress enacted two years after it amended Title VII to include "applicants for employment."  In 1974, Congress amended the ADEA to make it applicable to federal-government employment.  *See* Fair Labor Standards Amendments of 1974, Pub. L. 93-259, 88 Stat. 55, 74.  Notably, Congress expressly made the new provisions (codified at 29 U.S.C. § 633a) applicable to both employees and "applicants for employment."  *See, e.g.*, 29 U.S.C. § 633a(a). Yet while Congress amended the ADEA, in part to add coverage for "applicants for employment" in federal-government employment, it made no amendment to § 4(a)(2) to add "applicants for employment," despite having amended the parallel language of § 703(a)(2) of Title VII to add "applicants for employment" just two years earlier.

So to recap, the "applicants for employment" issue was on Congress's radar screen at the time that it enacted the ADEA without that language in § 4(a)(2); at the time that it amended the parallel provision of Title VII, after the ADEA had already been enacted; and at the time that Congress amended the ADEA itself, in part to provide coverage to "applicants for employment" in federal-government employment.  At any one of these times, Congress easily could have chosen to add the "applicants for employment" language to § 4(a)(2) of the ADEA.  It did not. We can't ignore that fact.

46

Nor does *Smith v. City of Jackson*, 544 U.S. 228 (2005), suggest that we can. Significantly, the *Smith* plurality "agree[d] that the differences between age and the classes protected in Title VII are relevant, and that Congress might well have intended to treat the two differently." *Id.* at 236 n.7 (plurality opinion). The plurality then cautioned that differences between the texts of Title VII and the ADEA are important, noting that differences between age and the classes protected in Title VII, "*coupled with a difference in the text of the statute . . .* , may warrant addressing disparate-impact claims in the two statutes differently."[2] *Id.* (emphasis in original). That is precisely what we have when we compare the texts of § 4(a)(2) of the ADEA and § 703(a)(2) of Title VII. Indeed, though the plurality did not consider whether § 4(a)(2) of the ADEA covers disparate-impact hiring claims, the plurality nonetheless recognized that "the scope of disparate-impact liability under ADEA is narrower than under Title VII." *Id.* at 240 (plurality opinion).

---

[2] While, as Judge Martin points out in footnote 8 of her dissent, §4(f)(1) of the ADEA was the provision under consideration in *Smith*, the Supreme Court did not limit its pronouncement that differences between age and the classes protected in Title VII, "*coupled with a difference in the text of the statute . . .* , may warrant addressing disparate-impact claims in the two statutes differently," as pertaining solely to differences between Title VII and § 4(f)(1) of the ADEA. *Smith*, 544 U.S. at 236 n.7 (plurality opinion). Instead, the Supreme Court broadly phrased its statement as a rule to be followed in the analysis of all disparate-impact claims under the ADEA and Title VII. It just so happened in *Smith*, though, that the Supreme Court was considering only whether § 4(a)(2) of the ADEA provides for a disparate-impact claim of any type to anyone. It was not looking at the issue of whether § 4(a)(2) provides for a disparate-impact claim in the context of hiring decisions.

For these reasons, I cannot find the ambiguity in § 4(a)(2) that my dissenting colleagues describe, so I concur in the Majority's decision holding that § 4(a)(2) does not provide coverage for disparate-impact hiring claims.

Nevertheless, as the Majority notes, *see* Maj. Op. at 24, that fact does not render disparate-impact evidence irrelevant or inadmissible in disparate-treatment cases under the ADEA. To the contrary, disparate-impact evidence can play an important role in proving a disparate-treatment claim, and nothing we have said here today suggests otherwise.

## II.

Because the language of § 4(a)(2), the statutory structure of the ADEA, and the history of amendments to the ADEA and Title VII all lead to only one viable interpretation of the meaning of § 4(a)(2), I concur in the Majority's decision to the extent that it holds that no cause of action for disparate impact hiring exists under the ADEA.

But I dissent from the Majority's decision on the equitable-tolling issue and join the dissents of my colleagues.

MARTIN, Circuit Judge, dissenting, in which WILSON and JILL PRYOR, Circuit Judges, join, and JORDAN and ROSENBAUM, Circuit Judges, join as to Part II:

The Supreme Court told us in Smith v. City of Jackson, 544 U.S. 228, 125 S. Ct. 1536 (2005), that people who have been discriminated against because of their age can rely on the Age Discrimination in Employment Act of 1967 (ADEA) to bring disparate impact claims. A disparate impact claim asserts that an employer engages in practices that may look neutral on their face, but in fact treat one group more harshly than another. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S. Ct 1843, 1854 n.15 (1977). Today's decision by the majority makes ours the first court of appeals to hold that Smith does not allow for disparate impact claims by people alleging discrimination in hiring. To get to this result, the majority ignores the plain text of the ADEA; rejects the interpretation that the governing agencies have used since 1968; and misreads the Supreme Court's landmark decision in Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849 (1971). Specifically, the majority says Griggs had nothing to do with discrimination in hiring. But to the contrary, Griggs did create disparate impact liability for discriminatory "hiring criteria." Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 576 U.S. __, __, 135 S. Ct. 2507, 2517 (2015). The text of the ADEA that we interpret here is identical to the text the Supreme Court interpreted in Griggs. This is just one of many reasons why this court should have reached the same result as the Supreme Court did in Griggs, and allowed

49

Richard Villarreal's disparate impact claim against R.J. Reynolds Tobacco Company (RJ Reynolds) to proceed.

Griggs isn't the only seminal civil rights case the majority misreads. The majority also says that Reeb v. Economic Opportunity Atlanta, Inc., 516 F.2d 924 (5th Cir. 1975), did not do what everyone has always said it did. Mr. Villarreal says he couldn't know that RJ Reynolds broke the law because the company did so in secret. For over forty years, this court has equitably tolled the limitations period for filing suit on discrimination claims "until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." Id. at 930. The reason for this rule is simple: "Secret preferences in hiring and even more subtle means of illegal discrimination, because of their very nature, are unlikely to be readily apparent to the individual discriminated against." Id. at 931. The majority now tells us that secret discrimination won't be punished unless the victim tried to expose the discrimination himself, even if he had no reason to suspect anyone was discriminating against him. This is contrary to our precedent. Our court has traditionally required victims of discrimination to act with reasonable diligence. Now, the majority requires victims to act with diligence beyond what reason would suggest.

Both of the majority's holdings in this case do harm to this court's precedent and to the nation's anti-discrimination laws.  I respectfully dissent.

## I.

Section 4(a)(2) of the ADEA says an employer may not

> limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

29 U.S.C. § 623(a)(2).  This plainly describes what RJ Reynolds did to Mr. Villarreal.  Specifically, Mr. Villarreal is an "individual" who was "deprive[d]" "of employment opportunities" and denied any "status as an employee" because of something an employer did to "limit . . . his employees."  To use a simple example, suppose a restaurant owner says he will pay college students more than he pays other employees.  Smith said this kind of wage differentiation could violate the ADEA.  Now suppose the same employer says he won't even hire someone who is not a college student.  This is plainly a decision to "limit . . . his employees" to college students.  And college students tend to be young, so this limit may "tend to deprive an[] individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age."  More to the point, an older "individual" could find himself "deprive[d] . . . of employment opportunities" or denied any "status as an employee, because of such individual's

age." The plain text of the statute covers a claim like this. And this perfectly natural reading is the one the EEOC has always used.

The majority says: no, when Congress wrote "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities" what it really meant (and said without ambiguity) was "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive [those] individual[s] of employment opportunities." The majority says the <u>only</u> reasonable reading of § 4(a)(2) is that the earlier reference to "his employees" (which describes who an employer can't "limit, segregate, or classify") must be assumed to impliedly narrow the plainly broader reference to "any individual" (which describes who can't be deprived of employment opportunities based on the employer's actions).

That's not what the statute says. Congress said age discrimination must not "deprive any individual of employment opportunities." If Congress intended to protect a narrower group, it would have said so. For example, the same sentence of § 4(a)(2) later uses the term "such individuals" to refer back to a set of people who were introduced earlier. And a different part of the sentence uses the word "employees," when referring to the people an employer can't "limit, segregate, or classify." But when the statute described the group who would be protected by this prohibition imposed on employers, Congress chose the term "any individual."

"This deliberate variation in terminology within the same sentence of a statute suggests that Congress did not interpret the two terms as being equivalent." United States v. Williams, 340 F.3d 1231, 1236 (11th Cir. 2003). The rest of § 4(a)(2) shows that Congress knew how to use narrower terms, but it chose to say "any individual" when referring to who can be injured by an employer's discrimination. We can't ignore that choice. To the contrary, "[t]he interpretive canon that Congress acts intentionally when it omits language included elsewhere applies with particular force" here, because Congress used the same language "in close proximity—indeed, in the same sentence." Dep't of Homeland Sec. v. MacLean, __ U.S. __, __, 135 S. Ct. 913, 919 (2015).

Saying the term "any individual" really means "employees" isn't the only way that the majority rewrites § 4(a)(2). The majority also says the phrase "deprive any individual of employment opportunities" can't mean refusing to hire someone. The majority's position here is that these clear words (again, "deprive any individual of employment opportunities") are impliedly limited by the later phrase "or otherwise adversely affect his status as an employee" in such a way that a person can never be "deprived of an employment opportunity" unless he also loses a current "status as an employee." Maj. Op. at 10. There are at least two problems with this. First, the majority reads "deprive any individual of employment opportunities" out of the statute. This violates the principle that

53

"every word [in a statute] is to be given effect."  Antonin Scalia & Bryan A.

Garner, Reading Law 174 (2012).

Second, even if we do take those words out of the statute, § 4(a)(2) still

applies to Mr. Villarreal's case through the statute's "adversely affect his status as

an employee" language.  Certainly it is true that Mr. Villarreal was denied any

"status as an employee."   Yet the majority says "affect his status as an employee"

can't refer to a job that someone wanted but didn't get because, according to the

majority, "[d]ictionaries confirm that the phrase 'status as an employee' connotes a

present fact."  Maj. Op. at 10.  This resort to abstract definitions is puzzling.

Dictionaries say what a word means.  They are far less useful for figuring out what

tense a word "connotes," since the same word can connote different tenses in

different contexts.  And before using dictionaries to "confirm" the tense of a word

in a statute, I would go to the Dictionary Act, which says that "unless the context

indicates otherwise . . . words used in the present tense include the future as well as

the present."  1 U.S.C. § 1.[1]

Also, the majority's statement that the phrase "status as an employee"

always "connotes a present fact" is just plain wrong.  Title VII also uses the words

"deprive or tend to deprive any individual of employment opportunities or

---

[1] The Dictionary Act was enacted in 1871 and must "be treated as if incorporated in and as a part of subsequent enactments."  Great N. Ry. Co. v. United States, 208 U.S. 452, 465, 28 S. Ct. 313, 316 (1908).

otherwise <u>adversely affect his status as an employee</u>."  42 U.S.C. § 2000e-2(a)(2)

(emphasis added).   And in Title VII, those exact same words prohibit hiring

discrimination.  Even so, the majority says it's impossible for the identical words

to do the same job in the ADEA.  Also, Title VII isn't the only place where the

word "status" is used to describe a status someone wanted but didn't get.  "Status"

is used this way all the time.  For example, a disability claimant can be "denied her

status as disabled."  <u>Joseph v. Chater</u>, 84 F.3d 433, 433 (5th Cir. 1996) (per

curiam).  Or an alien can be "denied status as a permanent resident."  <u>Santos v.</u>

<u>Immigration & Naturalization Serv.</u>, 375 F.2d 262, 264 n.1 (9th Cir. 1967).[2]  The

usage of the word "status" is clear once we leave the abstraction of dictionaries and

look at how the word is used in actual writing.

   In fact, the Supreme Court has even told us that when the word "employee"

"lacks any temporal qualifier" it can include people other than current employees.

<u>Robinson v. Shell Oil Co</u>., 519 U.S. 337, 342, 117 S. Ct. 843, 846–847 (1997).

Justice Thomas's unanimous opinion explained that parts of Title VII "use the term

---

[2] I could go on.  Someone trying to bring a class action can be "denied his status as class
representative."  <u>Duncan v. Tennessee</u>, 84 F.R.D. 21, 32 (M.D. Tenn. 1979).  Someone trying to
file a claim in bankruptcy court could be "denied priority status."  <u>Howard Delivery Serv., Inc. v.</u>
<u>Zurich Am. Ins. Co.</u>, 547 U.S. 651, 656, 126 S. Ct. 2105, 2109 (2006).  Someone trying to work
at sea can "be denied seaman status."  <u>Chandris, Inc. v. Latsis</u>, 515 U.S. 347, 372, 115 S. Ct.
2172, 2191 (1995).  Someone trying to do seasonal work could be "denied SAW [special
agricultural worker] status."  <u>McNary v. Haitian Refugee Ctr., Inc.</u>, 498 U.S. 479, 496, 111 S. Ct.
888, 898 (1991).  Someone drafted into war could "be denied CO [conscientious objector]
status."  <u>Clark v. Gabriel</u>, 393 U.S. 256, 264, 89 S. Ct. 424, 429 (1968).  Cases like <u>Santos</u> show
how the word "status" was used when Congress wrote the ADEA in 1967.

'employees' to mean something other than current employees," including at least one place where the term "most naturally is read to mean 'prospective employees.'"  519 U.S. at 343 n.3, 117 S. Ct. at 847 n.3.  <u>Robinson</u> underscores how radical the majority's reading of § 4(a)(2) is.  If "employees" can mean prospective employees, surely "any individual" can too.  But the majority says "any individual" <u>unambiguously</u> means "current employees" only.  That can't be right.

The text of the ADEA makes plain that "any individual" who is "deprive[d] . . . of employment opportunities" because of his age can a file a disparate impact claim.  The majority never explains why Congress chose the term "any individual" in § 4(a)(2) if it really meant "employee."  I say "any individual" means "any individual."  The plain text of § 4(a)(2) resolves this case in Mr. Villarreal's favor.  And this reading is only further confirmed by: (1) other parts of the ADEA; (2) the <u>Griggs</u> case; (3) the <u>Smith</u> case; and (4) deference to the EEOC.  I will discuss each in turn.

## A.

The phrasing of the rest of § 4(a) confirms that "any individual" in § 4(a)(2) means "any individual."  For example, no one disputes that "any individual" in § 4(a)(1) refers to job applicants.  And "a word or phrase is presumed to bear the same meaning throughout a text."  Scalia & Garner, <u>supra</u> at 170.  In fact,

whenever Congress meant anything other than "any individual" in § 4(a), it said so. Section 4(a) has three subsections, and only one does not use the term "any individual." That is § 4(a)(3), which prohibits "reduc[ing] the wage rate of <u>any employee</u>." 29 U.S.C. § 623(a)(3) (emphasis added). Since employees earn wages and non-employees do not, no one disputes that § 4(a)(3) applies solely to employees. Thus, Congress's choice of "any employee" rather than "any individual" in § 4(a)(3) makes sense.

In fact, § 4(a)(3) is a great tool for showing why the majority's imposition of extra-textual meaning onto § 4(a)(2) is so wrong. The majority says Congress expected courts to divine from other parts of the statute that "any individual" in § 4(a)(2) actually means "any employee." If that's true, Congress should have said "any individual" in § 4(a)(3) too. That is because everyone could divine from "wage rate" that "any individual" implicitly meant "any employee." Indeed, for § 4(a)(3) that assumption would be safer than for § 4(a)(2), since by definition, nobody other than employees can have their wage rates reduced. Yet Congress still said "any employee" rather than leaving this meaning to inference. Every time Congress meant "any employee" it said "any employee." And every time it meant "any individual" it said "any individual."  In § 4(a)(2) it said "any individual."

The majority compares § 4(a)(2) to other parts of the ADEA too, but both those arguments end up confirming why "any individual" in § 4(a)(2) really means

57

"any individual."  First, the majority asserts that "[u]nlike section 4(a)(1), section 4(a)(2) does not mention an employer refusing to hire someone."  Maj. Op. at 16. According to the majority, this means § 4(a)(2) can't possibly apply to hiring claims.  The majority accurately reports that § 4(a)(1) includes the phrase "refuse to hire" and § 4(a)(2) does not.  But § 4(a)(1) also says "to discharge" and then § 4(a)(2) does not.   Applying the majority's same logic therefore, we would have to say that § 4(a)(2) doesn't protect an employee from getting fired because of his age.  When asked about this at oral argument, RJ Reynolds responded that § 4(a)(2) does impose liability on an employer who fires someone for being old, but that liability comes from the later "adversely affect his status as an employee" language in § 4(a)(2).  But if firing claims come from that later language despite the earlier "to limit, segregate, or classify" language (which says nothing about firing), then surely failure-to-hire claims can come from the later "deprive any individual of employment opportunities" language.  As we know, that same language in Title VII allows failure-to-hire claims.  It must certainly do the same in the ADEA.

Second, the majority points to § 4(c)(2), which uses the words "status as an employee or as an applicant for employment" rather than "status as an employee" like § 4(a)(2).  Maj. Op. at 14–15.  The majority says this means § 4(a)(2) can't protect people who weren't hired for a job because of their age.  The problem with

the majority's reliance on § 4(c)(2) is that this subsection governs labor

organizations, not employers.  Specifically, it governs a labor organization's ability

to "refuse to refer for employment."  29 U.S.C. § 623(c)(2) (emphasis added).

This part of the statute targets the unique way in which labor organizations can

discriminate when they "refer" "applicants" to employers, such as through union

hiring halls.[3]  None of the other parts of the ADEA that govern employers say

anything about "referring" anyone for employment.  Employers, after all, don't

"refer applicants."  But labor organizations, by virtue of their unique referral role,

are sometimes the sole conduit by which an employer can get potential job

applicants.[4]  And § 4(c)(2) prohibits labor organizations from "refus[ing] to refer"

a person for employment at all because of her age and thereby denying her "status .

. . as an applicant for employment."  In other words, the statute protects someone

who sought work but was denied status as an applicant—that is, being allowed to

---

[3] For historical background on discriminatory union hiring halls, see Irving Kovarsky, Current Remedies for the Discriminatory Effects of Seniority Agreements, 24 Vand. L. Rev. 683, 694 n.47 (1971); Cornelius J. Peck, Remedies for Racial Discrimination in Employment, 46 Wash. L. Rev. 455, 470 (1971); Ralph K. Winter, Jr., Improving the Economic Status of Negroes Through Laws Against Discrimination, 34 U. Chi. L. Rev. 817, 824 (1967).

[4] See, e.g., Hiring Halls, Nat'l Labor Relations Bd., https://www.nlrb.gov/rights-we-protect/whats-law/employees/i-am-represented-union/hiring-halls (last visited Sept. 6, 2016) ("In some industries, most jobs are filled through referrals from union hiring halls.  Employers in the construction and maritime industries often choose to hire exclusively through referrals from union hiring halls."); Leslie W. Bailey, Jr., Collective Union Hiring Halls: Service Under a Collective Bargaining Agreement as a Prerequisite to High Priority Referral, 19 Wm. & Mary L. Rev. 203, 203 (1977) ("Frequently, a person cannot apply for work at the job site or otherwise deal directly with the contractor because an exclusive hiring arrangement exists between the contractor and a union.").

apply at all—due to labor organizations' control of the hiring process.  It's sometimes dangerous to infer what Congress meant in one part of a statute based on what it <u>didn't</u> say in other parts, at least without close analysis.[5]

## B.

I read the ADEA in the same way the Supreme Court read identical Title VII language in the seminal <u>Griggs</u> opinion.  <u>Griggs</u> held that this identical language in Title VII authorizes disparate impact claims.  When <u>Smith</u> read disparate impact liability into the ADEA, the Court "beg[a]n with the premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."  544 U.S. at 233, 125 S. Ct. at 1541.  The majority says <u>Griggs</u> is irrelevant because the plaintiffs in that case were current employees, not job applicants.  Maj. Op. at 19–21.  But the

---

[5] Along these lines, it's also dangerous to infer what Congress meant in a statute based on what it didn't say at all.  Judge Rosenbaum's concurrence details the history of the ADEA, which tracks the language of Title VII.  She focuses particularly on the fact that Congress never amended the ADEA to add the phrase "or applicants for employment" to § 4(a)(2).  But we cannot know what Congress meant by not amending the ADEA.  Perhaps Judge Rosenbaum's theory on Congressional intent is correct, but it's equally possible that Congress did not act because it thought the statute already encompassed job applicants. That is why the Supreme Court has warned us as a general rule not to give weight to legislative inaction when interpreting statutes.  For example, in <u>Crosby v. National Foreign Trade Council</u>, 530 U.S. 363, 120 S. Ct. 2288 (2000), the Court refused to conclude that Congress "repeatedly declin[ing] to enact express preemption provisions" implied anything "simply because the silence of Congress is ambiguous."  <u>Id.</u> at 386–88, 120 S. Ct. at 2301–02.  Although Judge Rosenbaum notes that <u>Crosby</u> was about preemption and not the ADEA, my point remains unchanged: we simply should not consider legislative inaction when interpreting statutes.

employment requirements challenged in <u>Griggs</u> were used both for initial hiring as well as for those already employed, but who were seeking to transfer to other positions within the company.  <u>See</u> 401 U.S. at 427–28, 91 S. Ct. at 852.  And the first sentence of the Supreme Court's unanimous opinion declared that the Court was deciding "whether an employer is prohibited . . . from requiring a high school education or passing of a standardized general intelligence test <u>as a condition of employment</u>."  401 U.S. at 425–26, 91 S. Ct. at 851 (emphasis added).  The Court broadly held that Title VII forbids employment selection practices that are "fair in form but discriminatory in operation," and it did not distinguish between the hiring employees and allowing them to transfer within the company.  <u>See id.</u> at 431, 91 S. Ct. at 853.

The Supreme Court has never limited <u>Griggs</u> as the majority suggests.  To the contrary, the Supreme Court has characterized <u>Griggs</u> as protecting job applicants.[6]  <u>See</u> <u>Connecticut v. Teal</u>, 457 U.S. 440, 446, 102 S. Ct. 2525, 2530

---

[6] Our Court has also characterized <u>Griggs</u> in this way.  <u>See</u> <u>EEOC v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1279 n.16 (11th Cir. 2000) ("In <u>Griggs</u> . . . the plaintiffs showed that the objective and facially neutral requirements . . . in order to be hired or transferred . . . had a disproportionate effect on white and black applicants."); <u>id.</u> at 1282 n.18 (reading <u>Griggs</u> to apply to "neutral hiring and promotion practices"); <u>Watkins v. Scott Paper Co.</u>, 530 F.2d 1159, 1179 (5th Cir. 1976) ("In <u>Griggs</u>, the Supreme Court held that a high school diploma requirement for hiring and transfer was not justified by business necessity."); <u>United States v. Ga. Power Co.</u>, 474 F.2d 906, 911 (5th Cir. 1973) ("In <u>Griggs</u> . . . the Supreme Court held that the proviso of this section means that no test used for hiring or promotion is valid if it 'operates to exclude [African Americans] [and] cannot be shown to be related to job performance.'" (second alteration in original)).

(1982) (noting that the challenged employment requirements in <u>Griggs</u> "applied equally to white and black employees and applicants, [but] barred employment opportunities to a disproportionate number of blacks"); <u>id.</u> at 458 n.2, 102 S. Ct. at 2536 n.2  (Powell, J., joined by Rehnquist, C.J., and O'Connor, J., dissenting) (noting that the tests in <u>Griggs</u> "were an absolute bar to transfers or hiring"). Indeed, the Supreme Court's most recent disparate impact case says <u>Griggs</u> governed "hiring criteria."  <u>Inclusive Cmtys. Project</u>, 135 S. Ct. at 2517.  This makes sense, because <u>Griggs</u> itself was broadly concerned with protecting the interests of minority groups, both in securing <u>and</u> improving employment opportunities.  <u>See</u> 401 U.S. at 430–31, 91 S. Ct. at 853 ("[T]he Act does not command that any person be hired simply because . . .  he is a member of a minority group. . . .  What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate."); <u>id.</u> at 431, 91 S. Ct. at 853 ("[T]ests or criteria for employment or promotion may not provide equality of opportunity merely in the sense of the fabled offer of milk to the stork and the fox.  On the contrary,

---

So have other courts.  <u>See</u> <u>El v. Se. Pa. Transp. Auth. (SEPTA)</u>, 479 F.3d 232, 239 (3d Cir. 2007) ("<u>Griggs</u> . . . dealt with aptitude tests administered by an employer in making hiring decisions."); <u>Harper v. Trans World Airlines, Inc.</u>, 525 F.2d 409, 411–12 (8th Cir. 1975) ("In <u>Griggs</u>, the Court struck down an employer's use of certain aptitude tests when they were shown . . . to have engendered discriminatory treatment concerning the hiring and transfer of blacks.").

Congress has now required that the posture and condition of the job-seeker be taken into account.").

The majority's reading of Griggs ignores its reasoning.  Griggs explained that disparate impact liability ensures that employers can't use subtle forms of discrimination that "'freeze' the status quo," create "artificial, arbitrary, and unnecessary barriers to employment," or "operate as 'built-in-headwinds' for minority groups."  401 U.S. at 430–32, 91 S. Ct. at 853–54.  But under the majority's reading of Griggs, Duke Power, the employer, was welcome to "'freeze' the status quo" and create all the "artificial, arbitrary, and unnecessary barriers to employment" it wanted by not hiring minorities at all.  We know this is wrong.  After deciding Griggs, the Supreme Court sent the case back to the District Court, which enjoined the use of discriminatory tests "as a condition of consideration for employment or promotion or transfer."  Griggs v. Duke Power Co., No. 210-G-66, 1972 WL 215, at *1 (M.D.N.C. Sept. 25, 1972).

## C.

The next reason I would allow Mr. Villarreal's claim to proceed is Smith v. City of Jackson, the Supreme Court's most recent opinion that interprets § 4(a)(2).  As I mentioned at the beginning, Smith held that § 4(a)(2) allows disparate impact claims.  Four Justices reached this result based on the plain text, though they also cited an EEOC regulation as evidence that "the agency charged by Congress with

responsibility for implementing the statute, 29 U.S.C. § 628, ha[s] consistently interpreted" § 4(a)(2) in the same way.  Smith, 544 U.S. at 239, 125 S. Ct. at 1544 (plurality opinion).  The plurality recognized that the regulation it was citing never "mention[ed] disparate impact by name" and never purported to interpret § 4(a)(2). Id.[7]  But the plurality nonetheless said this regulation "set[] forth the standards for a disparate-impact claim."  Id. at 240, 125 S. Ct. at 1544.  Justice Scalia (who added the fifth vote) went further, declaring that the EEOC's regulation made Smith "an absolutely classic case for deference to agency interpretation."  Id. at 243, 125 S. Ct. at 1546 (Scalia, J., concurring in part).

When comparing § 4(a)(1) and § 4(a)(2), the Smith plurality pointed to distinctions between employer motives and discriminatory effects as the "key textual differences" between those subsections.  Id. at 236 n.6, 125 S. Ct. at 1542 n.6.  In doing so, the plurality said nothing about the distinction between hiring versus other claims that the majority's entire effort to distinguish Smith is staked on.[8]  The plurality even cited two ADEA cases brought by job applicants in

---

[7] Indeed that regulation simply said: "When an employment practice, including a test, is claimed as a basis for different treatment of employees or applicants for employment on the grounds that it is a 'factor other than' age, and such a practice has an adverse impact on individuals within the protected age group, it can only be justified as a business necessity."  29 C.F.R. § 1625.7(d) (2004).

[8] Judge Rosenbaum's concurrence points out that the Smith plurality recognized that the difference in the text of the ADEA and Title VII could warrant treating disparate impact claims under the two statutes differently.  This is true.  But the plurality was specifically talking about § 4(f)(1) of the ADEA, which contains language that significantly narrows its coverage by

support of its statement that "for over two decades after our decision in <u>Griggs</u>, the

Courts of Appeals uniformly interpreted the ADEA as authorizing recovery on a

'disparate-impact' theory in appropriate cases." <u>Id.</u> at 236–37 & n.8, 125 S. Ct. at

1542–43 & n.8 (citing <u>Wooden v. Bd. of Educ. of Jefferson Cty.</u>, 931 F.2d 376

(6th Cir. 1991), and <u>Faulkner v. Super Valu Stores, Inc.</u>, 3 F.3d 1419 (10th Cir.

1993)).  If those were "appropriate" disparate impact cases, so is Mr. Villarreal's.

## D.

Eleven judges interpret § 4(a)(2) in today's ruling.  Among the eleven of us,

we read the statute to mean at least three different things.  While each of us feels

certain about the correctness of our own reading, we can't all be absolutely right.

And where a statute can be variously interpreted (or in the vernacular, is

"ambiguous"), courts must defer to the interpretation given by the agency charged

with enforcing the statute.  This is one more reason § 4(a)(2) must be read to

protect job applicants.  It is because the EEOC has always read the ADEA to

protect them.  And "it is axiomatic that the EEOC's interpretation of [the ADEA],

for which it has primary enforcement responsibility, need . . . only be reasonable to

---

permitting "otherwise prohibited" action "where the differentiation is based on reasonable
factors other than age."  29 U.S.C. § 623(f)(1).  Title VII includes no such language.  For that
reason, I don't think you can travel too far on <u>Smith</u>'s observation that "the scope of disparate-
impact liability under ADEA is narrower than under Title VII."  <u>Id.</u> at 240, 125 S. Ct. at 1544.
And because I understand Judge Rosenbaum and I to agree that <u>Smith</u> did not explicitly address
whether § 4(a)(2) provides for a disparate-impact claim in the context of hiring decisions, this
observation does not resolve the question before us.

be entitled to deference."  EEOC v. Comm. Office Prods. Co., 486 U.S. 107, 115,

108 S. Ct. 1666, 1671 (1988).[9]

The EEOC's ADEA disparate impact rule, which was issued through notice-

and-comment rulemaking, confirms that § 4(a)(2) protects applicants.  See 29

C.F.R. § 1625.7(c).  And a preamble section titled "Benefits of the Rule" uses the

EEOC's data on hiring discrimination to explain how the rule addresses "neutral

practices that act as barriers to the employment of older workers":

> Data show that older individuals who become unemployed have more
> difficulty finding a new position and tend to stay unemployed longer
> than younger individuals.  To the extent that the difficulty in finding
> new work is attributable to neutral practices that act as barriers to the
> employment of older workers, the regulation should help to reduce the
> rate of their unemployment.

---

[9] Related to this point, RJ Reynolds and its amici list various policy arguments in support of their view.  The majority did right by choosing not to indulge these arguments.  Policy choices belong to Congress and to agencies, not courts.  See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S. Ct. 2688, 2699 (2005).  Still, because some of these arguments might reappear in later litigation, I point out that they seem quite specious.  RJ Reynolds and its amici first warn that disparate impact liability for hiring criteria will end efforts to recruit recent graduates.  But the statute prohibits "limit[ing]" employees, and recruitment does nothing to "limit" anyone.  Instead it expands who will apply for a job.  Also, among the recruitment programs that RJ Reynolds's amici claims are under threat are initiatives to target minority graduates.  If those programs violate the ADEA, then they would have had to violate Title VII too.  But they don't.

RJ Reynolds's amici next argue that age discrimination doesn't require disparate impact, since all older workers were once young, so they didn't face a lifetime (let alone generations) of prejudice as with race discrimination.  The underlying point about race discrimination is a good one.  "[T]he persistence of racial inequality" requires effort "to counteract discrimination's lingering effects.  Those effects, reflective of a system of racial caste only recently ended, are evident in our workplaces."  Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 273, 115 S. Ct. 2097, 2135 (1995) (Ginsburg, J., dissenting) (citation omitted); see also Derrick Bell, Faces at the Bottom of the Well: The Permanence of Racism (1992).  But this argument should be recognized for what it is: an attempt to re-litigate Smith.  Smith says the ADEA imposes disparate impact liability for age discrimination.  The question in Mr. Villarreal's case is whether protection from the disparate impact of age discrimination extends to job applicants.

77 Fed. Reg. 19080, 19092 (2012) (footnote omitted).  This satisfies "the basic

procedural requirement[] of administrative rulemaking [] that an agency must give

adequate reasons for its decisions."   <u>Encino Motorcars, LLC v. Navarro</u>, __ U.S.

__, __, 136 S. Ct. 2112, 2127 (2016); <u>see also</u> <u>id.</u> ("The agency must examine the

relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made." (quotation

omitted)).

The EEOC has always held this same view.  The EEOC first said so through

notice-and-comment rulemaking in 1981.  <u>See</u> 29 C.F.R. § 1625.7(d) (1981).  That

"regulation affirmed . . . the longstanding position of the Department of Labor, the

agency that previously administered the ADEA."  <u>Smith</u>, 544 U.S. at 244, 125 S.

Ct. at 1547 (Scalia, J., concurring in part).  Indeed, as early as 1968, months after

the ADEA was signed into law, the Department of Labor ("which initially drafted

the legislation," <u>id.</u> at 239, 125 S. Ct. at 1544 (plurality opinion)) declared that

supposedly neutral "pre-employment" tests must be "reasonably necessary for the

specific work to be performed" and "equally applied to <u>all applicants</u>."  33 Fed.

Reg. 9173 (1968) (emphasis added); <u>Smith</u>, 544 U.S. at 239, 125 S. Ct. at 1544

(plurality opinion) (citing these "initial regulations" as evidence of the agency's

longstanding view).  And the EEOC explained the interpretative basis for that rule

to the Supreme Court over two decades ago.[10]  But the majority adopts the view

that the governing agency responsible for protecting against age discrimination has

read the statute wrong for nearly half a century.

*      *      *

The majority opinion never explains why Congress chose the words

"deprive any individual of employment opportunities" for § 4(a)(2).  Surely

Congress chose those words because it meant "deprive any individual of

employment opportunities" not "deprive [employees] of employment

opportunities."  The agency charged with enforcing the ADEA agrees.  That

should be the end of that.

II.

The majority's second holding may be even more harmful than its first.  Mr.

Villarreal says he "had no knowledge and no reason or means to know" about RJ

Reynolds's secret elimination of older workers from the hiring pool until just

before he filed his EEOC charge.   The majority holds that Mr. Villarreal's

equitable tolling claim cannot even survive a motion to dismiss because he did not

---

[10] See Petition for a Writ of Certiorari at 12–13, EEOC v. Francis W. Parker Sch., 515
U.S. 1142 (1995) (No. 94-1558), 1995 WL 17047545 ("The court of appeals . . . reasoned that . .
. [§] 4(a)(2) protects only incumbent employees.  That reasoning is seriously flawed.  By its
express terms, [§] 4(a)(2) is not limited to protecting incumbent employees.  Although [§] 4(a)(2)
makes it unlawful for an employer 'to limit, segregate, or classify his employees,' the employer
may not engage in such conduct 'in any way which would deprive or tend to deprive any
individual of employment opportunities.' The use of the term 'individual' rather than 'employee'
indicates that [§] 4(a)(2) protects applicants for employment." (citation omitted)).

try to uncover the secret policy earlier.  Part of why this holding is so troubling is

that it applies beyond the ADEA and beyond disparate impact claims.  For

example, suppose an employer intentionally screens out all black job applicants.

No applicant would suspect that such odious discrimination was the reason he

didn't get a job, especially if he filled out a standard online application (like Mr.

Villarreal did) or applied for dozens or hundreds of jobs (like many job seekers

do).  No reasonable applicant would assume that all those employers acted

unlawfully or accuse all of them of discrimination.

Even when a job-seeker has a nagging suspicion that he has been passed

over because of his age, it generally takes more than just suspicion to accuse an

employer of something so wrong.  And on the rare occasion when a job applicant

dares to bring up the subject, all employers are not likely to confess to illegal

conduct.  Some might.  But Mr. Villarreal's case comes to us on a motion to

dismiss, which means we are setting the baseline for every one of these cases.  Our

precedent until now has recognized that, "[s]ecret preferences in hiring and even

more subtle means of illegal discrimination, because of their very nature, are

unlikely to be readily apparent to the individual discriminated against." Reeb, 516

F.2d at 931.  Recognizing the difficulty in uncovering this type of discrimination,

our precedent protects against, for example, an employer who screens out every

black applicant and keeps this misconduct secret until the statute of limitations

69

period has run.  Under the majority's new rule, even if an insider came forward later to exposes this bad conduct, the victim could not benefit from the extraordinary revelation.  This change upsets over forty years of Fifth and Eleventh Circuit precedent.

## A.

The diligence required for equitable tolling is reasonable diligence.  And it isn't reasonable for every single job applicant to assume she was discriminated against.  The Supreme Court's equitable tolling cases confirm this.  The last time the Supreme Court confirmed that Title VII's limitations period "is subject to equitable doctrines such as tolling," the Court's unanimous opinion listed various "circumstances where it will be difficult to determine when the time period should begin to run."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108, 114 n. 7, 122 S. Ct. 2061, 2073 n.7 (2002).  For example, Justice Thomas wrote, "[o]ne issue that may arise in such circumstances is whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered."  Id.  But the Court concluded that the victim in that case "believed that he was being discriminated against at the time that all [the discriminatory] acts occurred."  Id. (quotation omitted).  For that reason, the Court ruled that the limitations period was not tolled.

The equitable tolling cases the Supreme Court decided before <u>Morgan</u> also touched on this idea of notice.  <u>See</u> <u>Irwin v. Dep't of Veterans Affairs</u>, 498 U.S. 89, 96, 111 S. Ct. 453, 458 (1990) (denying equitable tolling for a plaintiff who waited too long to sue after alleging the same discrimination in an EEOC charge); <u>Baldwin Cty. Welcome Ctr. v. Brown</u>, 466 U.S. 147, 151, 104 S. Ct. 1723, 1725 (1984) ("This is not a case in which a claimant has received inadequate notice").  It is true that some equitable tolling cases don't analyze notice in the same way, at least not expressly.  But those cases all address overt government deprivations, such as a denied social security claim, a breach of contract by the government, or a ruling on a criminal conviction.  In this type of case, notice can be assumed.  For example, a habeas petitioner can be assumed to have known about the ruling she is challenging from the moment the ruling issued.  Indeed the only way she wouldn't know is through something extraordinary, like deception or lawyer misconduct or abandonment.  The same isn't true for "[s]ecret preferences in hiring."  <u>Reeb</u>, 516 F.2d at 931.  In these cases, "subtle means of illegal discrimination, <u>because of their very nature</u>, are unlikely to be readily apparent to the individual discriminated against."  <u>Id.</u> (emphasis added).  That's why our court has always equitably tolled the limitations period for these claims "until the facts which would support a cause of action are apparent or should be apparent."  <u>Id.</u> at 930.

The majority says <u>Reeb</u> is not relevant here because "that decision involved active deception by the employer."  Maj. Op. at 27.  But our court has always said "equitable tolling does not require employer misconduct."  <u>Cocke v. Merrill Lynch & Co.</u>, 817 F.2d 1559, 1561 (11th Cir. 1987).  Also, <u>Reeb</u> did not turn on the employer's deception.  To the contrary, Judge Wisdom wrote that discriminatory hiring preferences tend to stay hidden "because of their very nature."  516 F.3d at 931.  Beyond that, any question about whether <u>Reeb</u> requires deception was resolved in <u>Tucker v. UPS</u>, 657 F.2d 724 (5th Cir. Unit B 1981).  The <u>Tucker</u> plaintiffs filed an EEOC charge more than 180 days after they were fired but less than 180 days after they learned that this firing might have been discriminatory.  The plaintiffs weren't misled, but the court allowed equitable tolling based on <u>Reeb</u>.  Chief Judge Godbold made the same point I make today:

> The 'prudent person' requirement of <u>Reeb</u> is not triggered by a seasonal black employee's being notified of an otherwise unexceptional decision that he is not going to be recalled.  It would be anomalous indeed if persons protected by the statute from racial discrimination are required to presume that they are being discriminated against.

<u>Id.</u> at 726.  The same is true for Mr. Villarreal.  He was not "required to presume" discrimination from the "otherwise unexceptional" fact that he didn't get a job offer.  <u>Id.</u>

Other courts have come to adopt the <u>Reeb</u> test too.  Indeed, this court once called <u>Reeb</u>'s notice requirement "a pronouncement that would be echoed by

various circuits across the country."  Jones v. Dillard's, Inc., 331 F.3d 1259, 1264

(11th Cir. 2003).  Now the majority characterizes that the Second, Seventh, and

D.C. Circuits courts as using a "general test" and says Mr. Villarreal has asked for

a "special test."  Maj. Op. at 26.  These vague labels do more to confuse than

clarify.  The fact is that all three of the courts the majority references cited Reeb to

hold that a plaintiff's lack of notice about employment discrimination is an

"extraordinary circumstance" that warrants equitable tolling.[11]  So have at least

three others.[12]  No court has ever criticized the Reeb test.  It is the test I would

apply here.

## B.

Under the majority's new rule, no discrimination victim can get equitable

tolling unless he assumes he was discriminated against, no matter how

---

[11] See Miller v. Int'l Tel. Corp., 755 F.2d 20, 24 (2d Cir. 1985) ("An 'extraordinary' circumstance permitting tolling of the time bar on equitable grounds might exist if the employee could show that it would have been impossible for a reasonably prudent person to learn that his discharge was discriminatory."); Vaught v. R.R. Donnelley & Sons Co., 745 F.2d 407, 410 (7th Cir. 1984) ("The tolling standard at issue here comes from the seminal case of Reeb[].); Stoller v. Marsh, 682 F.2d 971, 974 (D.C. Cir. 1982) ("Under Title VII, if an employee did not at the time know or have reason to know that an employment decision was discriminatory in nature, the time limits for filing an administrative complaint may be tolled.").

[12] See Allen v. Diebold, Inc., 33 F.3d 674, 676 (6th Cir. 1994).  Though the Eighth and Ninth Circuits have never cited Reeb, they apply this same standard.  See Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1329 (8th Cir. 1995) ("[W]hen a reasonable person in the plaintiff's situation would not be expected to know of the existence of a possible ADEA violation, this excusable ignorance may provide the basis for the proper invocation of the doctrine of equitable tolling."); Boyd v. U.S. Postal Serv., 752 F.2d 410, 414 (9th Cir. 1985) ("The time period for filing a complaint of discrimination begins to run when the facts that would support a charge of discrimination would have been apparent to a similarly situated person with a reasonably prudent regard for his rights.").

unreasonable that assumption might be.  I believe "this standard is too rigid."

Holland v. Florida, 560 U.S. 631, 634, 130 S. Ct. 2549, 2254 (2010).  When

Holland overruled our court's equitable tolling standard, the Supreme Court

instructed that

> the "exercise of a court's equity powers must be made on a case-by-
> case basis."  . . . .  The "flexibility" inherent in "equitable procedure"
> enables courts "to meet new situations that demand equitable
> intervention, and to accord all the relief necessary to correct particular
> injustices." . . .  Such courts exercise judgment  . . . with awareness
> of the fact that specific circumstances, often hard to predict in
> advance, could warrant special treatment in an appropriate case.

Id. at 649–50, 130 S. Ct. at 2563 (citations omitted) (alterations adopted).  After

Holland, we finally recognized that "[e]quitable tolling is, well, equitable in nature,

and decisions regarding it must be made 'on a case-by-case basis' in light of

'specific circumstances, often hard to predict in advance.'"  Hutchinson v. Florida,

677 F.3d 1097, 1098 (11th Cir. 2012) (quoting Holland, 130 S. Ct. at 2563).  The

majority ignores that lesson here.

Worse, the majority's rigid test makes little sense.  The majority says Mr.

Villarreal's case needed to be dismissed because he didn't "investigate the status of

his application."  Maj. Op. at 28.  The majority never explains why this distinction

matters.  Even if Mr. Villarreal learned that his application had been rejected, that

would reveal nothing about whether the rejection was discriminatory.  Neither

would an inquiry from Mr. Villarreal about the status of his application have made

any difference to RJ Reynolds.  Job applicants follow up on their applications all the time.  That routine occurrence does not give notice to the employer that a discrimination charge is coming.  Mr. Villarreal's complaint said he filed an EEOC charge as soon as he learned that RJ Reynolds used illegal hiring criteria to reject his application.  And he claims he could not have learned about that secret conduct earlier.  This is enough, in my view, to survive a motion to dismiss his case on the pleadings.

I don't dispute that equitable tolling requires plaintiffs to act diligently.  But the requirement has always been <u>reasonable</u> diligence.  I see no basis to conclude that Mr. Villarreal acted unreasonably here.  In fact, RJ Reynolds and its amici expressly ask us to speculate about facts that are not in the record.  RJ Reynolds says Mr. Villarreal's actions were unreasonable because he "did not even try to inquire about his application.  If he had, RJ Reynolds would have told him that it was seeking entry-level salesmen with less experience."  And the Chamber of Commerce adds that Mr. Villarreal could have looked up whether the people RJ Reynolds hired created profiles on the social networking website LinkedIn and then researched the ages of those people somewhere else.  But this appeal comes to us on a motion to dismiss.  That means we can't assume anything about what RJ Reynolds "would have" said.  And we certainly can't know if using LinkedIn to build a cause of action would have been either reasonably prudent or at all fruitful.

One thing we <u>can</u> know however is that "subtle means of illegal discrimination, because of their very nature, are unlikely to be readily apparent."  <u>Reeb</u>, 516 F.3d at 931.

Employers who act illegally should not escape liability just because their conduct was hidden through the end of the limitations period.  In cases where illegal conduct is exposed after the limitations period, I would allow discovery on the question our court has always asked in these cases: when did the "facts which would support a cause of action [become] apparent . . . to a person with a reasonably prudent regard for his rights"?  <u>Id.</u> at 930.  If discovery is limited to that question, the burden on defendants will be minimal.  On that note, it's worth remembering that equitable doctrines arise out of concern for the circumstances of both sides of a case.  If RJ Reynolds showed that Mr. Villarreal's delay was prejudicial in some way (such as due to lost evidence), a court would have to take that into account.  But that never happened here.  Instead, the majority says delay is always unacceptable, even if a victim had zero reason to act earlier.  The Supreme Court held six years ago that this court's equitable tolling "standard is too rigid."  <u>Holland</u>, 560 U.S. at 634, 130 S. Ct. at 2554.  The majority's new rule returns us down that path.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 05, 2016

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  15-10602-AA
Case Style:  Richard Villarreal v. R.J. Reynolds Tobacco Company, et al
District Court Docket No:  2:12-cv-00138-RWS

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.
.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call David L. Thomas, AA at (404) 335-6169.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs